Argument this morning is 17-1695 Shell Oil Company v. United States. Mr. White. Thank you, Your Honor, and may it please the Court. The Court of Federal Claims' decision in this case on remand should be reversed for three main reasons. First, the Court failed to allocate the waste at the McCall site between the waste that was produced as a result of ad gas production from the waste that was produced. Are you challenging the use of the three-part test from Indiana-Michigan Power? That's the Court of Federal Claims' use. We're challenging their interpretation of the taxes clause itself. But you're not challenging the use of the test? No, we're not challenging the use of a test for how you determine damages in the event of a breach. What we're arguing here is that the taxes clause itself cannot be interpreted in a way that results in the governments being responsible for not only the waste generated as a result of ad gas production, but also the waste that was generated through production of all the commercial products. It seems like there are two types of non-ad gas contract-related dumpings that could be at issue. Dumping related to waste created while making ad gas for non-government contracts and dumping related to waste created while making petroleum products or other non-ad gas products from the spent acylation acid which was used initially to make the ad gas for the government contracts. Would you agree that that second type, the products made from the residual from government contracts, would still fall under the government's responsibility for cleanup? No, and that's our that's our primary contention in this case, your honor, is that the language of the taxes clause which says the charges that the oil companies are required to pay by reason of the manufacturer production sale of the commodities delivered under the contracts is very specific and it doesn't permit this attenuation of the spent alkylation acid in its use in producing other refinery products to bring those other wastes under the umbrella of the ad gas. Where does the, you say in the reply brief on page six that the court of federal claims found the government agreed, I'm quoting, government agreed to absorb all charges for everything plans sold even though ad gas represented a small fraction of the total refining process. Where did the court of federal claims say ad gas was a small fraction of the process? Here's my core concern about the whole government's whole approach to this. A lot of what you're saying is, well, the war started December 8th, 1941, in fact, they did the December 7th when Congress declared war, and prior to that there was no war. So there wasn't, production of ad gas and the use of the acid didn't fall within the ambit of what we're talking about. I think that's a fair summary of what you're saying, right? Correct, your honor. But there's a lack of historical context there. You've heard the phrase great arsenal of democracy. The whole, Roosevelt's approach from 1940 on, Len Lee's, production of ad gas was in large part about two things. One, the British were trying to defend their isles and it gave them an advantage in their fighter defense, and two, we're getting ready to go to war. And the United States has posted a peacetime draft, is massively ramping up production of fighter planes. That's a historical fact, it's all going on. Yes, your honor, but this is contract law. These were sophisticated parties that made contracts with the government for the sale of ad gas. There was recognition in these contracts that other products were going to be made and sold at a profit by these oil companies, and the very fact that the contract referred to those other products, but yet in the taxes clause has no language that would sweep into the charges that the government's responsible for. The waste that is created through the production of those other products means that it's an unfair and unreasonable interpretation of this contract to hold that the government had agreed to do that despite the historical context. Tell me if you know, it's not in the record and I scrutinized. One of the things Shelf says is there were specialized train cars for transportation of the spent acid for reprocessing and they wanted to do that and the government refused to provide those specialized cars. Were those being taken for a war purpose like the Manhattan Project? That I don't know the answer to, your honor. I do know that in the circle litigation in district court and also in the court of federal claims decision there was a recognition of that as being a reason why some of the spent alkylation acid was dumped, but what we're concerned about in this case is not the dumping of the spent alkylation acid, it's the dumping of the acid sludge that was produced when the spent alkylation acid was used to acid treat the other refinery products such as motor oil and kerosene and all the other products that were being made and sold by... But that was in the government's interest for two reasons. One, because it was a by process, I'm not going to say by product, but by process of the production of avgas and everybody knew it, and two, the government had an interest in all those other products being provided to the public. The government did have an interest in that only in the sense that there were shortages of some of these other products during the war years and also because... There was rationing. And in the contracts themselves there were price escalation clauses which would have permitted the oil companies to seek additional cost to the basic price of avgas in circumstances where unexpected changes to their normal refinery operations would have increased their cost. So the government did have an interest in that, but it's not an interest that was reflected in what the government would pay for through the taxes clause, which was very, very specific. As I understand the government's argument, it's about how if there had not been any avgas contracts, all these oil companies would have made all these non-avgas petroleum products anyway, and those non-avgas petroleum products result in asset sludge. And so therefore, why should the government have to pay for the cost of cleaning up that asset sludge? Is that the gist of it? Yeah, in a nutshell. Even the facts found by the Court of Federal Claims in this case demonstrated that these oil companies had historically dumped waste... Okay, but let me go a little farther. I understand the Claims Court's reasoning to be, well, with these avgas contracts, the oil companies were put under tremendous stress to produce maximum avgas, and to do that, they had to dramatically increase their crude throughput in their refineries, which necessarily resulted in a lot more volume of the non-avgas petroleum products also being produced along with the avgas products that were being produced. And it was that scale, that extra dimension of magnitude of asset sludge that was being produced by all these different products that needed to be refined to do maximum production of avgas, that was just too much for the oil companies at the time to handle through reprocessing, through transporting it away, so that they had ultimately no choice, due to the scale of the requirements put on it by the government, to then do nothing but to accept dumping at the McColl site. So if all of that is true, and it's also true that one year after the war was over in 1946, that none of the oil companies were actually doing any more dumping because they were no longer under the government imposition of maximum production of avgas, why isn't that a fair thing for the Claims Court to conclude that, but for the avgas contracts, we wouldn't have had this kind of dumping or we wouldn't have dumping at all at the McColl site? Well, the facts that were also addressed demonstrated that there was dumping historically by these oil companies going back to the 1930s or earlier. That was their normal operation, it wasn't any different in terms of finding a pit in the ground and dumping. Also, the facts were found by the Trial Court that there had been dumping at this particular site, the McColl site, prior to any deliveries of avgas to the government under this contract, and that there had been dumping relating to the production of avgas that wasn't sold to the government through these contracts. So even looking at that, avgas production is partially resulting in increases in other products that increased other waste. There was no allocation made, no sense of trying to determine what those proportions were. We did propose, in our post-trial brief in this case, a method of potentially allocating these wastes. Did you do it in the lead-up to the trial or the actual trial itself? Yes, the argument was made that waste could be allocated by, for example... But didn't you just say in response to Judge Chen that in your post-trial brief, you presented a method for allocation? Yes, this was in the post-trial brief. Well, was that same thing introduced at trial or offered at trial or pre-trial? It's a theory that is based on the testimony of the government expert witness in the case. I mean, did the government try to chop it up in the sense at trial where they tried to explain, even if you don't agree with the government, that the government shouldn't have to clean up any of the sludge from the non-AVGAS products, there's still a way to do some more smaller, refined form of apportionment. It was produced... Due to the inevitability of some amount of sludge that would have been dumped, regardless of whether these AVGAS contracts had forced the oil companies to produce a dramatically more amount of products in general. The argument was that you could allocate this by looking at what increased amount of acid sludge was created by the fact that the oil companies were beginning their production of the other refinery products with a lower quality spent alkylation acid instead of fresher acid. The result of using the acid to treat the AVGAS involved certain substances in that spent alkylation acid, one of them called red oil, which when used again at a lower purity to treat the other products would increase slightly the amount of sludge that was produced. So are you saying then that what the oil companies should have done with the spent alkylation acid is just to have dumped it rather than to have used it, rather than to have repurposed it in the production of the non-AVGAS products? And then if they had done that, then the government would have had to pick up the tab for that cleanup? If they had... Excuse me, your honor, I think I may be misstating your question, but I think you're saying that if the government is saying that the alkylation acid used in the production of the other products is not the government's responsibility, are we saying that they should have dumped the spent alkylation acid? Is that what you're... Right. And then the government, you would say, would be responsible for that because it was directly due to the production of AVGAS. Yes. The government has never taken the position that if spent alkylation acid was directly dumped at McCall that the government would be responsible for that in light of the interpretation of the taxes clause from this court. The government argued at trial that there was no dumping of spent alkylation acid. The oil companies were wrong to have attempted to repurpose the spent alkylation acid for producing the non-AVGAS products. They weren't wrong to do it. Our position is that whether they were right or wrong, the taxes clause does not make that waste stream one which is by reason of AVGAS delivered under the contracts and that the interpretation of the contract has to stop with that. So if the spent alkylation acid is created and dumped, the government is on the hook. If the spent alkylation acid is reused while in the production of other products which these oil companies are selling to consumers, then it's not. Let me ask you this. Well, two things. One, following up on what you just said, what if the government is selling those other products or the shell is selling those other products to the government? It wouldn't matter if it was under the products that were delivered under that contract as defined in the taxes clause or the AVGAS that was purchased through those contracts. So if the rest of that byproduct was used for military purposes, it would be irrelevant. Right. In the same way that we recognize that there was other AVGAS that was being sold at least in 1943, likely being sold to the government just probably directly to the military services instead of to the DSC, that was not AVGAS that was sold under these contracts and the waste that was created and dumped from that AVGAS. Our time is short, so I want to follow up. I want to go back to your carefully worded statement that the theory regarding apportionment was presented at trial. Was the argument itself made? I think you're talking, when you say theory, you're talking about an expert witness. Right. In my mind, I'm thinking about the government's post-trial brief. This may have been the argument in the pre-trial briefs as well, but it certainly was presented to the court prior to the decision as a method of potentially allocating this in a manner different from what the court did, which was to simply say... But I'm interested in timing and I want to know if it was presented, of course, in a pre-trial brief, that would be of interest, but if it was not presented until a post-trial brief, it leaves Shell up in the air. I assume they cross-briefed. Well, there were reply briefs in response to the party's post-trial briefs, and so my recollection is that there is a response to the government's argument from Shell prior to the court's ruling on the case. I see I'm well into my read. Thank you, Chief Judge Prost, and may it please the court. When this case was last here, the court remanded with instructions that the trial court answer a single factual question. How much of the acid waste at the McCall site was there by reason of the production of ABGAS under the contracts at issue? That question obviously tracked directly from the relevant contractual language, and the first point I'd like to make, Your Honors, is that my friend Mr. White with all due respect is adding words to the contractual language. We're entitled to all charges that were incurred by reason of the production of ABGAS. He's asking you to add the words to the end of that sentence and not having any connection whatsoever with any non-ABGAS products. Well, that's not what the clause says. It's under the circumstances of the times, it's a logical non-entity because of what I said. That is that in the words of the people at the time, don't you know there's a war on? And everything, once the declaration of war was issued, and even before, but once the declaration of war was issued, the President had well-known dictatorial powers. And it wasn't just that one board. There was the War Production Board. There were all kinds of entities that had power to direct the production and use of war-related materials, and petroleum and all its byproducts were considered war munitions. The most important war munition, it was often said, Your Honor. Absolutely correct. The record before the trial court was such that the government hasn't come close to showing that the court's finding that all of the waste at the McCall site was there by reason of the production of ABGAS. They haven't come close to showing that that's clearly erroneous. And there's really a couple of different ways I would suggest the court could look at this question. Are you saying that there was zero dumping at the McCall site before the contracts were entered into? That is correct, Your Honor. The contracts were entered in the first half of 1942. The site was opened, I believe, in the last week of June of 1942, and the first dumping was thereafter. Now, the government has made an argument, which I think Judge Wallach referenced in one of his questions to my friend, that there was a small amount of waste that was dumped at the site after it was opened and after the contracts that were entered that the government says was not generated as part of the manufacture of ABGAS under these contracts. It was ABGAS that was manufactured to fill out some remaining contracts that they'd had with different parts of the government. I entering this exclusive contract with DSC. And our submission on that, Judge Chen, is that the small portion of waste that was dumped before production began under these contracts. And then, by the way, it was only Shell of the four oil companies that had dumped that. The other three did not begin dumping until much later when production under these contracts was at issue. But we would say that that small amount of waste that was dumped, that was the result of non-contractual ABGAS production, is irrelevant for two different reasons. First, the court below found, and the government hasn't challenged this, I don't believe, that the oil companies opened the McCall site in anticipation of the enormous volume of acid waste that would be generated by ABGAS production under these contracts. The court's finding on that is at Joint Appendix 32. Do you know why the... I'm interrupting your train of thought. Do you know why the specialized rail cars were not available? Your Honor, I don't. When Your Honor asked the question to my friend, we did quickly scour the stipulations. And as Your Honor noted, it's been agreed for 25 years in this case that the government controlled them, which is a known historical fact. And the government did not permit them to use the ones in existence during the early years. By the later years of the war, they'd ordered more manufactured, but I don't know what they were using them for since. It may very well have been, especially in the early years, to ship ABGAS itself to the East Coast or Gulf ports for shipment to Europe. But the short answer is it's not in the record. But just to continue my the site in anticipation of all of the waste that would be generated by production under these contracts, it follows that the site would not have existed. And the small amount of pre-contractual waste would not have been dumped at the site, but for the production of ABGAS under the contracts. How small is small? What was the actual amount? 200 barrels or... No, it was more than that. Your Honor, I don't remember the exact amount. 200,000 barrels? I don't believe it was 200,000 barrels, but it was a relatively small percentage of the total. What percentage? 0.5%? It's more than that. 2.5? It's more than that. It's probably in the 15 to 20... Scaring me. But if Your Honor would like to quantify that in a way that goes to the bottom line, I would direct Your Honor to joint appendix page 47, where the trial court did do an analysis that attempted to quantify the amount of damages attributable to this pre-contractual, non-contractual ABGAS. And the number that the court came up with was $723,578.26. So it's a very precise figure. Basically, the court calculated this by determining the amount of non-contractual acid waste dumped at the site per cubic yard, and then multiplying that by the cost of remediating each cubic yard of waste. And Judge Chen, if you're not convinced by my arguments for why this ought to be irrelevant, and I have a second one that I hadn't gotten to yet, and I'll come back to that. But if you're not convinced by both of my arguments and you feel that this must be taken into account, I would strongly urge the court, rather than remanding this case for yet another round of damaged proceedings, inevitably followed by yet another, and I believe it would be the fourth, appeal to this court, I would strongly urge you to, instead of remanding, simply modify the judgment in light of the court's finding, quantifying that number, and affirming the judgment as modified so that we can finally bring this case to an end. Now, I said it was irrelevant for two reasons. First being, they wouldn't have opened the site but for the massive amount of claims found that the relatively small portion, and I admittedly didn't have the number at the tip of my tongue, Judge Chen, did not affect the remediation costs incurred by the oil companies, and was therefore irrelevant. Essentially, what the court found was that the remedy was what the environmental scientists call a containment remedy, where they built this structure that went down the sides and over the top, and because the waste was dumped evenly across the 12 sumps at this site, they would have had to build the same remedy regardless of whether this small additional amount of waste was there or not. And so that, to my mind, is the second reason why you can disregard this pre-contactual waste. I did want to return briefly to my friend's argument that the waste that was generated by the reuse of the spent alkylation acid in the manufacture of non-ABGAS products somehow should be disregarded here. I would suggest there are two ways to look at this. One is the way, Judge Chen, I think you referenced in questioning my friend. In 1946, the court found that there was no waste whatsoever sent to McCall after they had stopped ABGAS production. And the evidence showed that the reason for that was that ABGAS production in multiple different ways, I think there were a total of five of them, and those are set out with references to the testimony on pages 28 and 29 of the red brief. But in all these different ways, the fact that you're producing ABGAS necessarily ramps up acid sludge that's produced. In fact, if you compare the throughput in 1946 when there's no ABGAS production with the throughput in 1944, for every 10,000 barrels of crude going through the refinery in 1944 when they're making ABGAS, they're generating 68 barrels of acid sludge. In 1946, on a per barrel basis, every 10,000 barrels of throughput is only generating 20 barrels. So by stopping ABGAS production, you reduce sludge production by 60%. And you have the railcars available. And you have the railcars, and that's an additional benefit. That's absolutely right, Judge Wallach. And here's the other critical point about this. It's not as though during the war that all of the acid waste that was being generated was being dumped. To the contrary, by reusing, recycling, and reprocessing to the extent plants were available, to the extent tank cars were available, the oil companies successfully reused, reprocessed, or recycled 72% of the waste that were generated. What's more, the court found that dumping was the last resort. They only dumped if they couldn't make any of these other solutions to the problem work. So if you think about it, all they had to do to end dumping is reduce the generation of acid waste by 28%. If all of this is true, then why was there any dumping at all going on in the late 30s and very early 1940s? According to all your very interesting statistics, there would have been no dumping at that time either. The answer to that question is threefold, three different factors. Factor number one, in the early 1940s, 41, 42, 43, technology for minimizing the generation of waste took a leap forward. There were two key points in this. One was the development of catalytic crackers, and the second was the development of a process called hydrogeneration. I'm not saying it right, but it's in the record. Those two things together very much reduced the amount of waste being produced on a per barrel basis. Second factor, before the war, there were very few reprocessing plants for reprocessing spent alkylation acid or recycling acid sludge. As the war progressed, while it took longer than it should have because of the necessary delays, because the government had other wartime priorities, those resources came online and began to reduce the problem by increasing reprocessing and recycling capacity. The third point is the one Judge Wallach referenced. As the time went on, more and more tank cars became available. The upshot is the Court of Federal Claims made a direct finding, and this is on, I believe, JA 47, that 1946 is the proper but-for year. The court specifically rejected the government's argument that, no, you ought to look at 1941 or the 1930s. Those three reasons, those changes in technology in the early 1940s, more than support that finding and defeat any argument that it was clearly erroneous to look to after the war as opposed to before the war for your comparison. And government, you have to keep the historical context in mind. Government priorities change. In the 1930s, you're talking about industrial policy related to economic recovery and what was cheap to do. In the 1940s, recycling was the thing. Little kids gathered tin foil and so on. People kept their baking grease. All of that is absolutely correct. Second way to look at the problem, besides the but-for analysis, you could look at the process by which it was generated, and I think Judge Chen, again, you had some questions about this that really went to this point. It's important to recognize that the government has admitted that every bit of waste at the site, all of it, had its origins in sulfuric acid that was used to make alkylate, which was a component of ABGAS. And it was only that some of it was reused that we've had this argument on the non-ABGAS products. But it's important to understand that when the government fully understood that refineries are integrated entities, and that the manufacturer of ABGAS necessarily carried with it the manufacturer of these non-ABGAS products, I would refer the court to the contract itself that specifically says, and this is Joint Appendix of 1475, that normal operation of the refinery will result in substantial quantities of motor fuel and other products that must necessarily be produced and sold in connection with the production of 100-octane gas. Isn't it in effect something like a columnar still? Yes, that's exactly right, Your Honor. What Judge Walloff is talking about is when the crude first enters, they have this still that breaks the crude into fractions. Fully 79% of the fractions are not usable when you make ABGAS. Only the best 21% of fractions can be used for ABGAS. But you've still got all these other fractions that you have to do something with, and the only thing you can do with it is to manufacture these other points. And the keyboarders have. You have to. You must. You have to. And during the war, you have to. That's exactly right. And with the court's indulgence, if I could make one last point, any doubt on this is shown by the party's performance. That acid that was first used in the making of alkylate and then reused in the non-ABGAS products, 100% of that acid cost on the front end was charged to ABGAS, even though the government knew full well that that acid would be reused in non-ABGAS products. Everyone understood that the acid was something that was driven by the production of ABGAS. There was testimony in the record, as I recall, from an administrator who said, if you hadn't done that, I would have just taken the plant away. Your Honor, that's exactly right. Thank you. Thank you, Your Honor. Okay, points, Your Honors. The idea that the government is responsible under the taxes clause for waste that had nothing to do with the waste stream from the production of ABGAS, because McCall was opened in anticipation of the ABGAS contracts. Again, this is contract law. The taxes clause cannot be interpreted in a manner that expands this to include not only these products that are not ABGAS and the waste from those products, but also the waste that was created and dumped at a time when, it's true, it was after the contracts were signed, at least after the first contracts were signed, but before any of the ABGAS was actually delivered to the government under these contracts when they were dumping other products. You'd agree that all of those contracts are subject to force majeure? The force majeure clause is in these contracts. And in wartime, the government's powers were quintessentially force majeure. But still, there's a very precise requirement in this clause. But you recall, I'm sure, the testimony, I think it was a written interview of an administrator who said, if they hadn't done what I said, I would have just taken the plant away. But that doesn't create a basis, Your Honor, for basically saddling the taxpayers with all of the waste that was created during the wartime that related in a small percentage to the production of ABGAS and in a large percentage to the acid sludge that was created through the other products. This is the result of the Court of Federal Claims decision is that the government was in for a little, so it owes everything. And that's what we contend is inconsistent with the plain language of the clause. A lot of these facts are really not that relevant. What was relevant here was the interpretation. Again, when we were here the last time in 2013, the interpretation was, well, can the taxes clause itself extend beyond taxes to circular remediation costs? And this court said it could. Now the question is, and this is fundamental to this case, is can the taxes clause reach the waste of circular remediation costs that wasn't created as a direct result of the production of that ABGAS? There's a historical context. We agree. There's also the fact that there was a waste stream, which by its very nature was going to result to a certain extent in the waste product of ABGAS production being used to produce other products. But none of that changes what we believe is the proper interpretation of the contract. I'm just curious how much money is on the line for the cleanup of the acid sludge from the non-ABGAS products in the McCall site? From the non-ABGAS products? Yeah. Well, it would have been a very high percentage because the amount of spent alkylation acid was roughly a very small percentage. It would have been under 15%. In fact, the government was arguing at one point that there was no spent alkylation acid dumped, but the court made a finding that a certain amount of spent alkylation acid and acid sludge was present at McCall. We're not going to argue with those facts, but the percentage was very small. Even in this court's prior decision, it recognizes that 82% of the waste that was dumped related to the acid sludge from the non-ABGAS products. Largely, the government's being asked to take on 80% in addition to the amount which would have been reasonably allocated to the government's ABGAS contracts. Final point, time's up. Well, one last point, Your Honor. The argument that 1946, if the court was going to look at a buck for a year, and the Court of Federal Claims mentioned that and used it, but then ignored it in favor of saying that it was a single remediation solution by EPA, so it didn't matter. The government was responsible for everything. But if the court was looking at this with an eye towards allocation, we disagree with the idea that 1946 after the war is the appropriate buck for a year for a lot of reasons, including the fact that these oil companies were really in a totally different world and with new facilities and everything was different by 1946, and we should be more concerned with what they would have done in the war years in the absence of their upgraded facilities that the government paid for through the war. Thank you. We thank both sides in the case.